COLEMAN & BALOGH LLP
ETHAN A. BALOGH, No. 172224
JAY A. NELSON, No. 258431
235 Montgomery Street, Suite 1070
San Francisco, CA 94194
Telephone: 415.391.0440
Facsimile: 415.373.3901
eab@colemanbalogh.com
jay@colemanbalogh.com

Attorneys for Defendant
BLESSED MARVELOUS HERVE

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 13 Cr. 293 CRB |
| Plaintiff, | SENTENCING MEMORANDUM; OBJECTIONS TO PRESENTENCE REPORT |
| v. | Date:       January 22, 2014 |
| BLESSED MARVELOUS HERVE, | Time:       10:00 a.m.<br>Courtroom:  6, 17th Floor |
| Defendant. | Before the Honorable Charles R. Breyer<br>United States District Judge |

1    **I.  Preliminary Statement**

2        Defendant Blessed Marvelous Herve, by and through his counsel, respectfully submits the

3    following Sentencing Memorandum and Objections to the Presentence Report ("PSR").  Mr.

4    Herve comes before the Court having pleaded guilty to one count of wire fraud, in violation of 18

5    U.S.C. § 1343.  He is subject to a statutory sentencing range of zero to 20 years incarceration,

6    and the United States Sentencing Guidelines, properly calculated, advise a sentence of 33-41

7    months.  The Government and United States Probation ask the Court to sentence Mr. Herve to 37

8    months incarceration.  *See* Dkt. 31 ¶ 15; PSR Sentencing Recommendation.  With due regard for

9    both those offices and their assessments of this case, Mr. Herve respectfully contends that both

10   overstate the appropriate sentence, which Mr. Herve recommends to be 33 months.  Accordingly,

11   pursuant to *United States v. Booker*, 543 U.S. 220 (2005) and the factors set forth in 18 U.S.C. §

12   3553(a), Mr. Herve respectfully asks the Court to sentence him to 33 months in custody ("the

13   recommended sentence").

14   **II.  Overview**

15       "It has been uniform and constant in the federal judicial tradition for the sentencing judge

16   to consider every convicted person as an individual and every case as a unique study in the

17   human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to

18   ensue." *Koon v. United States*, 518 U.S. 81, 113 (1996).  "Underlying this tradition is the

19   principle that the punishment should fit the offender and not merely the crime."  *Pepper v.*

20   *United States*, —U.S —, 131 S. Ct. 1229, 1240 (2011) (internal quotations and citation omitted).

21       This Court has broad discretion to sentence Mr. Herve within the sentencing range

22   applicable to the sole count.  Subsequent to the great sea change occasioned by *Booker*, this

23   Court again stands as the arbiter of a just and proper sentence, empowered and required to "make

24   an individualized assessment" of a just sentence pursuant to the factors presented in 18 U.S.C. §

25   3553(a).  *Gall v. United States*, 552 U.S. 38, 50 (2007).  This return of broad discretion is

26   appropriate because "[t]he sentencing judge is in a superior position to find facts and judge their

27   import under § 3553(a) in the individual case."  *Id*. at 51-52.

28       The Supreme Court's "post-*Booker* opinions make clear that, although a sentencing court

     must 'give respectful consideration to the Guidelines, *Booker* permits the [C]ourt to tailor the

1   sentence in light of other statutory concerns as well.'" *Pepper,* 131 S. Ct. at 1241, *quoting*

2   *Kimbrough v. United States*, 552 U.S. 85, 101 (2007).  Accordingly,"'although the Guidelines

3   should be the starting point and the initial benchmark,' district courts may impose sentences

4   within the statutory limits based on appropriate consideration of all the factors listed in [18

5   U.S.C.] § 3553(a), subject to appellate review for 'reasonableness.'" *Id*., *quoting Gall*, 552 U.S.

6   at 49-51.

7          The Court is thus charged to "impose a sentence sufficient, *but not greater than*

8   *necessary*, to accomplish the goals of sentencing, including to reflect the seriousness of the

9   offense, to promote respect for the law, to provide just punishment; to afford adequate

10  deterrence; and to protect the public from further crimes of the defendant." *Kimbrough*, 552 U.S.

11  at 101 (internal quotation marks and citation omitted) (emphases added); *see also* 18 U.S.C. §

12  3553(a).  Accordingly, Mr. Herve addresses the section 3553(a) factors in turn, so that the Court

13  may make an individualized assessment of the appropriate sentence here.

14                        **III.  The Section 3553(a) Factors**

15  **A.      Section 3553(a)(1).**

16         Section 3553(a)(1) directs the Court to evaluate "[t]he nature and circumstances of the

17  offense and the history and characteristics of the defendant."

18         **1.      The history and characteristics of Blessed Marvelous Herve.**

19         The "unique study in the human failings" presented by this case reflects a man deeply

20  scarred by the tragedy of personal loss.  *Koon*, 518 at 113.  After the death of his mother due to

21  complications from childbirth, Mr. Herve was raised by his father—who was then a high-level

22  government official in the Republic of Congo—and his stepmother and extended family.  PSR ¶¶

23  43-44, 46.  Mr. Herve demonstrated an early talent for music, and he honed his craft through

24  musical studies as a child and young adult, including at the University of Marien Ngouabi in

25  Brazzaville, Congo.  *Id.* ¶¶ 57-58.

26         Mr. Herve's passion for music led him to this country as a young man.  In 1992, he

27  entered the United States on a student visa (with financial support from the government of

28  Congo) to study music at Azusa Pacific University in Azusa, California.  *Id.* ¶¶ 46, 57.  That

                                        2

1   decision proved to be a fateful event, and forever altered the course of Mr. Herve's life. Shortly

2   after he arrived in the United States, the Republic of Congo experienced a change in government,

3   and a wave of political violence ensued, resulting in the assassinations of every member of his

4   family left in the Congo, including his father, stepmother, siblings, and other relatives. *Id.* ¶¶ 44-

5   46. Accordingly, although Mr. Herve managed to escape murder by the happenstance of

6   studying abroad, his life—which was previously characterized by peace and comfort—was

7   upended, and he found himself stranded, alone, and penniless in a foreign land, unable to return

8   home for fear of violent reprisal. *See id.*

9       Despite these emotional and financial hardships, Mr. Herve carved out a life for himself

10  in the United States by learning English and supporting himself primarily through work as a

11  security guard. *Id.* ¶¶ 64-65. He also, however, lost his legal status in the United States—having

12  lost his government aid to attend Azusa Pacific University, and thus his student visa—and in a

13  desperate (though misguided) attempt to avoid removal to the Congo, he procured false

14  documents in support of a United States passport application. *Id.* ¶¶ 32-33, 36. Although that

15  conduct culminated in a misdemeanor conviction and probationary sentence imposed by the

16  Honorable Marilyn Hall Patel, *id.* ¶ 33, it also had the effect of catalyzing Mr. Herve's

17  application for asylum, which immigration authorities granted in 1998. *Id.* ¶ 47.[1]

18      Mr. Herve then made a life for himself in San Francisco. He supported himself through

19  various service industry jobs, all while also trying to forge a career in music. *See id.* ¶¶ 61-63.

20  Importantly, he also applied his musical talents for the benefit of charity, donating so many

21  performances to charitable fundraising events that he received a stream of accolades from

22  federal, state, and local elected officials, including (a) two Certificates of Special Congressional

23  Recognition from Nancy Pelosi and Tom Lantos, respectively; (b) a Commendation from

24  Governor Gray Davis; (c) a Certificate of Recognition from the California State Senate; (d) a

25  Certificate of Recognition from the California State Assembly; and (e) two Certificates of Honor,

26  from Mayors Willie Brown and Gavin Newsom, respectively. *See* Exhibit A.

27  

28      [1]Mr. Herve later naturalized as a United States citizen. PSR ¶ 47.

3

Lurking beneath the surface, however, was a deep gulf between the public persona Mr. Herve projected and strove to achieve—*i.e.*, that of a successful musician performing for wealthy and public figures—and his inner life, which was (and is) defined by debilitating mental illness due to the murder of his family.  Although Judge Tigar denied Mr. Herve's request for funds to conduct a psychiatric evaluation, the record discloses (at least some of) the emotional and mental distress from which Mr. Herve continues to suffer, and the ways in which his illness manifests itself, thus informing the appropriate sentence in this case.

Most directly, Mr. Herve has been diagnosed with major depressive disorder, a condition that "'causes clinically significant distress, or impairment in occupational, social, and other important areas of functioning.'"  PSR ¶ 54.[2]  Among other manifestations, Mr. Herve has suffered—and continues to suffer—from nightmares, fits of crying, anxiety, thoughts of suicide, feelings of hopelessness, social withdrawal, insomnia, and deteriorating physical health, including obesity and kidney problems.  *See id.* ¶¶ 51-55; *see also* US001191-92.[3]  According to a psychologist who treated Mr. Herve near the time of his prior case, these symptoms were "a response to the combined stressors of incarceration, deaths of family members, and fear of his own death."  US001192.

In light of these difficulties, and despite his best efforts, Mr. Herve's mental illness impedes his ability to maintain interpersonal relationships.  For example, although Mr. Herve (a) made child support payments for his daughter prior to his current incarceration, and (b) continues to fight for custody of his son (even from jail), he has been unable to maintain relationships with either of his children's mothers, and as a result, both have taken the extreme measure of withholding the children from him, leaving Mr. Herve without meaningful contact with either of his children.  PSR ¶ 48.

---

[2]Mr. Herve has also been informed by mental health professionals that his symptoms are consistent with post traumatic stress disorder.

[3]Citations bearing the prefix "US" refer to the discovery produced by the United States in this case.

So too, Mr. Herve's living conditions cast light on his inner struggles.  As the PSR notes, the conditions of Mr. Herve's San Francisco apartment may most accurately be described as squalid.  The bathroom facilities were broken and unusable, and the kitchen was also grim and cluttered to the point of inoperability.  *Id.* ¶ 49.  In addition, the apartment was littered with large, disorganized stacks of papers and files, including thousands of California lottery tickets.  *Id.*  The home was further stacked with hundreds of dress shirts, suits, hats, and ties, many of which remained unopened in their retail packaging.  *Id.*  The apartment was thus difficult to navigate, with only narrow, isolated portions available to walk upon and sit.  *Id.*

In other words, Mr. Herve comes before the Court as a broken man who straddles two worlds: (1) an imagined one—modeled on the one he lost—characterized by comfort, culture, ease, and privilege, and (2) his real one, characterized by pain, isolation, the hoarding of material possessions, and withdrawal from society due to the tragic loss of his family and the upheaval of his life.  Against this backdrop, Mr. Herve committed the fraud in this case.

### 2.    The nature and circumstances of the offense.

United States Probation characterizes Mr. Herve's offense as "particularly heinous[.]" *Id.*, Sentencing Recommendation.  Mr. Herve does not contest the seriousness of his conduct—indeed, he deeply regrets the harm he has caused—but he disagrees with the Probation Officer's assessment of this case.[4]

To begin, Probation contends that the crime was not a "crime of opportunity or impulsive act[,]" and instead, that Mr. Herve "preyed upon the victims relentlessly[.]" *Id.*  Contrary to Probation's view, however, Mr. Herve did not set out to "prey[] upon" B.E. or K.W.[5]  Instead, and in contrast to the narrative provided B.E., Mr. Herve's relationship with B.E. began—and continued for some time—as a genuine friendship characterized by mutual respect, trust, and

---

[4]Mr. Herve also finds curious Probation's characterization of the offense as "particularly heinous" while recommending a mid-range Guidelines sentence that differs from the recommended sentence by only four months.

[5]Mr. Herve maintains the convention, adopted by the Government and Probation, of referring to the complaining witnesses by their initials.

honesty.  Indeed, Mr. Herve and B.E. not only maintained a personal friendship, but also took steps toward becoming business partners, including the establishment of a jointly-managed limited liability corporation under Nevada law for the purpose of entering, among other possible ventures, the wine business.  *See* Ex. B (LLC registration documentation).  Accordingly, Mr. Herve's initial receipt of funds from B.E. was not induced by the misrepresentations at issue in this case, but instead, B.E. deposited the funds with Mr. Herve as a good faith gesture to (a) to support his friend, and (b) set aside funds with an eye toward the pair's planned business ventures.

Regrettably, Mr. Herve—who once lived a life of comfort, but had long since been relegated to less than modest means—succumbed to temptation, failed to preserve the funds entrusted to him by B.E., and then misled B.E. with the inaccurate statements at issue in this case.  The situation spiraled out of control, and Mr. Herve neither succeeded in paying B.E. back, nor in extracting himself from the series of inaccurate excuses he offered B.E. and K.W. to support his requests for funds.  In sum, Mr. Herve did not set out to defraud B.E. and K.W., although he ultimately made a series of false representations that did just that.

In addition, this was an unsophisticated fraud.  A brief internet search easily reveals that the President of the Republic of Congo is Denis Sassou Nguesso, whose name bears no resemblance to Mr. Herve's, and thus easily could have raised a red flag.  *See* http://en.wikipedia.org/wiki/Republic_of_the_Congo.[6]  So too, it is difficult to understand how B.E.—himself a successful and sophisticated Marin County realtor—could have believed such (admittedly fantastical) claims as (a) that a foreign head of state would require funds from him to rent bulletproof limousines, PSR ¶ 7, (b) that Mr. Herve had a "secret session" before the United States Supreme Court, *id.* ¶ 11; or (c) that Mr. Herve, who was himself requesting funds from B.E. for living expenses, was living at the Four Seasons Hotel, *id.* ¶ 9.  There must be more to this story.

---

[6]If fact, although B.E. plainly did not know as much, Nguesso is presumed to be the person responsible for the murders of Mr. Herve's family.  PSR ¶ 44.

1    The fact that this fraud occurred, let alone for such a long period of time, suggests another

2    aspect of this case overlooked by Probation: that the fraud was facilitated, at least in part, by

3    B.E.'s own greed.  The four promissory notes in this case—in which Mr. Herve promised to pay

4    B.E. "sums of $500,000 and $1,000,000 in exchange for his financial support[,]" Dkt. 31 ¶

5    2—may fairly be described as usurious.  So too, it was *B.E.*, *not* Mr. Herve, who involved K.W.

6    in these matters, and who urged K.W. for money to give to Mr. Herve.  *See* PSR ¶ 10.  Contrary

7    to Probation's view, *see* PSR ¶ 11, Mr. Herve never "told KW" anything; instead, his

8    communications were with B.E., and it was *B.E.* who persuaded his girlfriend to part with her

9    funds.  Accordingly, although Mr. Herve expressly does not shift blame for his *own* conduct to

10   B.E., B.E.'s desire to make "easy" money from his friend, who for much of the time (by his own

11   account) B.E. believed was in custody and in desperate need of financial assistance, presents a

12   different circumstance than Probation suggests.  So too, B.E.'s eagerness to seek funds from

13   K.W. can not be attributed solely to Mr. Herve.

14   Finally, Mr. Herve disagrees that he did not intend to repay B.E. and K.W.  *Cf.* PSR,

15   Sentencing Recommendation.  In fact, the thousands of lottery tickets found inside Mr. Herve's

16   home demonstrate that he was desperate to find a way out of his downward spiral of

17   misrepresentations.  Although this route plainly provided an unrealistic way to seek relief from

18   his fraud, Mr. Herve maintains that he did—and does—intend to repay his debts.

19   **B.    Section 3553(a)(2).**

20   Section 3553(a)(2) directs the Court to evaluate a sentence sufficient to "(A) reflect the

21   seriousness of the offense, to promote respect for the law, and to provide just punishment for the

22   offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from

23   further crimes of the defendant; and (D) to provide the defendant with needed educational or

24   vocational training, medical care, or other correctional treatment in the most effective manner."

25   As the Supreme Court in *Kimbrough* made plain, the Court should fashion a "a sentence

26   sufficient, but not greater than necessary" to meet these goals.  552 U.S. at 101.

27   In this case, Mr. Herve respectfully submits that the recommended sentence is "sufficient,

28   but not greater than necessary" to satisfy each of the section 3553(a)(2) factors.  While Mr. Herve

1    recognizes the seriousness of this offense, the recommended sentence includes a significant

2    custodial term—for a man who has never before served a day in prison—that itself satisfies each

3    of the section 3553(a)(2) factors.

4           In addition, as noted, this was an unsophisticated and easy-to-detect fraud, which suggests

5    a low likelihood of recidivism.  In other words, although Mr. Herve can assure the Court that he

6    needs no additional deterrence, it is difficult to imagine Mr. Herve—whose name has, in any

7    event, been broadcast in the press because of this case—undertaking similar conduct again.

8           It is true, as Probation notes, that Mr. Herve does not have an unblemished criminal

9    record, but his prior misdemeanor conviction was (a) remote in time, (b) committed out of a

10   desperate attempt to avoid the same fate as his family, and (c) the recommended sentence

11   presents a considerable increase from the probationary sentence imposed by Judge Patel, thus

12   satisfying the principle of incremental punishment, and sending a clear message to Mr. Herve

13   that he must not reoffend.

14          Mr. Herve also asks the Court to consider the significant punishments he has already

15   suffered.  In addition to the embarrassment of these public findings of guilt, and the difficulty (if

16   not impossibility) of obtaining custody of his son following this case, Mr. Herve has also

17   suffered unduly harsh conditions in pretrial custody, which stem from his courageous act of

18   alerting the deputies to a dangerous situation inside the jail, which caused the deputies to move

19   Mr. Herve into administrative segregation for his own safety.[7]

20          Finally, in light of Mr. Herve's mental condition—which his prior psychologist

21   (unsurprisingly) opined was aggravated by incarceration—Mr. Herve respectfully contends that

22   minimizing the length of his incarceration, while remaining within the bounds of his plea

23   agreement, will greatly assist him in reintegrating into society upon release, thus permitting him

24   to more quickly find employment and commence the process of repayment to B.E. and K.W.

25   ////

26   _____

27          [7]For this reason, Mr. Herve respectfully asks the Court to order his transfer to FCI Dublin
     after sentencing, rather than require him to wait for his BOP designation under the harsh
28   conditions in which he currently lives.

1   Similarly, Mr. Herve asks the Court to account for the much greater likelihood that he will

2   receive adequate treatment for his kidney condition out of custody.

3        Under all of these facts, Mr. Herve respectfully suggests that the recommended sentence

4   satisfies the requirements of section 3553(a)(2).

5   **C.     Sections 3553(a)(3), 3553(a)(4), 3553(a)(5).**

6        Sections 3553(a)(3) through (a)(5) direct the Court to assess the kinds of sentences

7   available statutorily and pursuant to the United States Sentencing Guidelines, as well as the

8   policy statements and amendments issued by the United States Sentencing Commission. This

9   section gives effect to *Kimbrough*'s directive for this Court to consider the advisory guidelines

10  like the rest of the section 3553(a) factors.

11       There are no disagreements regarding these factors. Count One provides for a statutory

12  sentencing range of zero to 20 years imprisonment. *See* 18 U.S.C. § 1343; Dkt. 31 ¶ 1; PSR ¶ 69.

13       Similarly, the parties agree that the Sentencing Guidelines should be calculated pursuant

14  to USSG § 2B1.1; that the proper calculation begins with Base Offense Level 7; that the offense

15  level should be increased by 16 based on a loss amount exceeding $1,000,000; and that Mr.

16  Herve should receive a three-level reduction for acceptance of responsibility, resulting in a Total

17  Offense Level of 20. USSG §§ 2B1.1, 3E1.1; Dkt. 31 ¶ 7; PSR ¶¶ 20-29, 70. So too, there

18  should be no disagreement that Mr. Herve falls into Criminal History Category I, yielding an

19  advisory Guidelines range of 33-41 months. PSR ¶¶ 35, 70.

20  **D.     Section 3553(a)(6).**

21       Section 3553(a)(6) directs the Court to consider the need to avoid unwarranted sentencing

22  disparities among defendants with similar records who have been found guilty of similar

23  conduct. The recommended sentence, which falls within the advisory Guidelines range, would

24  not cause unwarranted sentencing disparities within the scope of this rule.

25  **E.     Section 3553(a)(7).**

26       The last section 3553 factor requires the Court to consider "the need to provide restitution

27  to any victims of the offense." Mr. Herve agrees to the restitution amount of $1,605,926 set forth

28  by United States Probation, *see* PSR ¶ 13, and affirms his commitment to making full restitution

in this matter.  So too, Mr. Herve reiterates that in contrast to the 37-month sentence requested by the Government and Probation, the recommended sentence would permit him to more quickly reintegrate back into society upon release from custody, and thus begin the important process of repayment.

## IV.  Objections to Presentence Report

For the reasons set forth below and in the text above, Mr. Herve respectfully objects to the Presentence Report on the following grounds:

**Objection No. 1:**

Mr. Herve objects to the inclusion of the purported alias "Rodrigue Herve Ndandou" on the caption page of the PSR, and he asks the Court to strike it.  Mr. Herve is unaware of any evidence that supports his alleged used of that name.

**Objection No. 2:**

Mr. Herve objects to paragraphs 36-39 of the PSR, and he asks the Court to strike them. This section consists of unsustained criminal accusations, not "Other Criminal Conduct" as the PSR reports.  At a minimum, Mr. Herve asks the Court to order this section restyled with a more accurate title such as "Unsustained Criminal Allegations" or "Other Criminal Allegations[.]"

**Objection No. 3:**

With respect to paragraph 39, Mr. Herve objects to the detailed recitation of the complaining witness's discredited—and dismissed—accusations, and he asks that this inflammatory material be removed.  In addition, although the PSR refers to eight counts at issue, the complaint only brought four, including one count each of (i) rape, (ii) sodomy (not "crimes against nature"), (iii) false imprisonment, and (iv) oral copulation.  US000586-87.

**Objection No. 4:**

With respect to paragraph 45, Mr. Herve objects to Probation's recitation of an alleged factual dispute between prior Government and defense counsel regarding the murder of Mr. Herve's family, and its conclusion that Mr. Herve "should be given the benefit of the doubt with regard to these biographical details."  Although Government counsel may have held "doubt" at the time of the prior PSR (upon which paragraph 45 relies), as of this writing, there is no "doubt"

regarding these matters.  Not only was Mr. Herve granted asylum in 1998 on the basis of these facts, but so was his application for permanent residency in the 2000s.  So too, notwithstanding Mr. Herve's disagreement with the Government regarding the appropriate sentence in this case, he is not aware that the United States Attorney's Office continues to contest these facts.  Accordingly, Mr. Herve asks that the PSR be amended to reflect the tragic loss of his family without reference to any purported "doubts" on the topic.

**Objection No. 5:**

Mr. Herve objects to the PSR's recitation that Mr. Herve "reported that he has no prior history of mental or emotional problems, and no history of formal treatment or medication for such problems."  PSR ¶ 54.  As the PSR itself recognizes, Mr. Herve "is still struggling with the murder of his family members, and has experienced depression[.]"  *Id.* ¶ 55.

**V.  Conclusion**

For these reasons, Mr. Herve respectfully asks the Court to impose the recommended sentence.

Respectfully submitted,

DATED: January 15, 2014                    COLEMAN & BALOGH LLP


ETHAN A. BALOGH
JAY A. NELSON
235 Montgomery Street, Suite 1070
San Francisco, CA 94104

Attorneys for Defendant
BLESSED MARVELOUS HERVE

# EXHIBIT A



US 000434



GOVERNOR GRAY DAVIS

## *Commendation*

### Blessed Marvelous Herve

July 12, 2000

It is a great pleasure to recognize you for your hard work and unselfish dedication to improving the lives of those in the San Francisco community. By generously sharing your time, energy and skills as a composer and pianist, you have made a positive and lasting impact on many lives.

I salute your remarkable compassion and ongoing commitment to public service. Your extraordinary volunteer work truly makes a difference and serves as an inspiration for all Californians.

On behalf of the people of the State of California, I extend best wishes for continued success.

*Gray Davis*
Governor Gray Davis

STATE CAPITOL • SACRAMENTO, CALIFORNIA 95814 • (916) 445-2841

US 000435





**U.S. HOUSE OF REPRESENTATIVES**

Certificate of Special
Congressional Recognition

*Presented to*

**Blessed Marvelous Herve**

*in recognition of outstanding and invaluable*
*service to the community.*

April 1, 2000
DATE

*Nancy Pelosi*
MEMBER OF CONGRESS

US 000437



The City and County of San Francisco

# Certificate of Honor

Presented To

## Blessed Marvelous Herve

### January 31, 2005

*Whereas*, on behalf of the City and County of San Francisco, I am pleased to recognize and honor Blessed Marvelous Herve for his dedicated service to the citizens of San Francisco. Best wishes and good luck in your future endeavors!

**THEREFORE**, I have hereunto set my hand and caused the Seal of the City and County of San Francisco to be affixed.

*Gavin Newsom*
Mayor

US 000438



# Certificate of Special

# Congressional Recognition

*Presented to*

## Blessed Marvelous Herve

*in recognition of outstanding and invaluable
service to the community.*

March 21, 2000

DATE

*Tom Lantos*

MEMBER OF CONGRESS

US 000439



The City and County of San Francisco

# Certificate of *Honor*

Presented To

## BLESSED MARVELOUS HERVE
## APRIL 1, 2000

**WHEREAS**, on behalf of the City and County of San Francisco, I am pleased to join the community in recognizing and honoring Blessed Marvelous Herve for his dedicated service to the citizens of San Francisco and thank him for sharing his musical gift with all of us. I wish him continued success and happiness.

**THEREFORE**, I have hereunto set my hand and caused the Seal of the City and County of San Francisco to be affixed.

Willie Lewis Brown, Jr.
Mayor

US 000440

# EXHIBIT B

# BE MARVELOUS LLC

## Business Entity Information

| | | | |
|---|---|---|---|
| Status: | Revoked | File Date: | 8/5/2008 |
| Type: | Domestic Limited-Liability Company | Entity Number: | E0508152008-2 |
| Qualifying State: | NV | List of Officers Due: | 8/31/2009 |
| Managed By: | Managing Members | Expiration Date: | |
| NV Business ID: | NV20081087828 | Business License Exp: | |

## Registered Agent Information

| | | | |
|---|---|---|---|
| Name: | UNITED STATES CORPORATION AGENTS, INC. | Address 1: | 500 N RAINBOW BLVD STE 300A |
| Address 2: | | City: | LAS VEGAS |
| State: | NV | Zip Code: | 89107 |
| Phone: | | Fax: | |
| Mailing Address 1: | | Mailing Address 2: | |
| Mailing City: | | Mailing State: | NV |
| Mailing Zip Code: | | | |
| Agent Type: | Commercial Registered Agent - Corporation | | |
| Jurisdiction: | NEVADA | Status: | Active |

## Officers

☐ Include Inactive Officers

| Managing Member - B████ E█ | | | |
|---|---|---|---|
| Address 1: | 59 DAMONTE RANCH PARKWAY | Address 2: | STE B BOX 313 |
| City: | LAS VEGAS | State: | NV |
| Zip Code: | 89107 | Country: | |
| Status: | Active | Email: | |
| Managing Member - BLESSED M HERVE | | | |
| Address 1: | 59 DAMONTE RANCH PARKWAY | Address 2: | STE B BOX 313 |
| City: | LAS VEGAS | State: | NV |
| Zip Code: | 89107 | Country: | |
| Status: | Active | Email: | |

## Actions\Amendments

| | | | |
|---|---|---|---|
| Action Type: | Articles of Organization | | |
| Document Number: | 20080529469-35 | # of Pages: | 1 |
| | | | |

| File Date: | 8/5/2008 | Effective Date: | |
|---|---|---|---|
| (No notes for this action) | | | |
| Action Type: | Initial List | | |
| Document Number: | 20080619255-68 | # of Pages: | 1 |
| File Date: | 9/24/2008 | Effective Date: | |
| ILO | | | |

**PROOF OF SERVICE**

I, Jay A. Nelson, certify that on January 15, 2014, I served all parties in this matter by filing the preceding pleading electronically, as set forth by Local Rule 5-1.  I also served United States Probation Officer Patrick McFate with a copy by electronic mail.


Dated: January 15, 2014                    JAY A. NELSON

1