MELINDA HAAG (CABN 132612)
United States Attorney

J. DOUGLAS WILSON (DCBN 412811)
Chief, Criminal Division

W. DOUGLAS SPRAGUE (CSBN 202121)
Assistant United States Attorney

   450 Golden Gate Avenue, Box 36055
   San Francisco, California 94102-3495
   Telephone: (415) 436-7128
   FAX: (415) 436-7234
   doug.sprague@usdoj.gov

Attorneys for the United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) CASE NO. CR 13-0293 CRB |
| Plaintiff, | ) |
| | ) UNITED STATES' SENTENCING |
| v. | ) MEMORANDUM |
| | ) |
| | ) Date: January 22, 2014 |
| BLESSED MARVELOUS HERVE | ) Time: 10:00 a.m. |
|   AKA RODRIGUE HERVE NDANDOU | ) |
|   AKA HERVE RODRIGUE NDANDOU | ) Honorable Charles R. Breyer |
|   AKA BLESSED ROLL HERVE, | ) |
| | ) |
| Defendant. | ) |
| | ) |
| | ) |
| | ) |

Defendant operated a fraudulent scheme over 6 years that only ended because he was caught.

Unfortunately, by that time he had stolen more than $1.6 million from his retirement-age victims, and

their loss correlated directly to his gain. Unlike even some white collar criminals, defendant had no

intent or ability to return *any* funds to his victims, and he fully intended to steal every dollar his victims

had or could get through liquidating retirement accounts and by obtaining loans from family and friends

and against insurance policies and homes now lost to foreclosure. Yet defendant has shown no remorse.

1

1    For the reasons set forth below and in the Presentence Investigation Report (PSR), the

2  government respectfully requests that the Court sentence defendant to 37 months in prison, three years

3  of supervised release, no fine, restitution of $1,605,926, and the mandatory $100 special assessment.

4  **The Offense Conduct**[1]

5    In approximately early 2006, victim BE, a real estate broker, placed an advertisement for a

6  $6,000,000 luxury home in Tiburon. Defendant, purporting to be a potential client, responded to this

7  advertisement. After having BE drive defendant around to see several luxury homes over the course of

8  several weeks, including a $45,000,000 property in Atherton, defendant told BE that defendant was the

9  son of the President of the Congo. Defendant said his father was extremely wealthy and wanted to pay

10 cash for several expensive homes in the Bay Area.

11   After setting up the con, defendant's first effort to separate BE from his money was based on

12 defendant's ruse that his rich father was coming to the Bay Area. Defendant claimed, however, that his

13 wealthy father would travel to the United States only if defendant had bulletproof limousines arranged to

14 transport him while here. Defendant asked BE to advance the cash for these limousine rentals, and BE

15 did so. Although these purported visits kept being cancelled, defendant obtained cash from BE each

16 time to arrange the limousine service.

17   Having taken about $30,000 from BE through the limousine aspect of his fraud, defendant

18 moved to the next aspect of his scheme. He told BE that the United States had seized $43,000,000 of

19 defendant's money after defendant transferred it from Switzerland to San Francisco. Upon defendant's

20 verbal and written promises of paying him back plus interest and huge bonuses, BE loaned defendant

21 approximately $100,000 through 2006.

22   Defendant then introduced another element of his fraudulent scheme, the alleged top secret court

23 case against him. Defendant told BE that this secret case involved the $43,000,000 that had been seized

24 from him. Defendant had BE pick him up at the Four Seasons, though never from a room—always out

25 front or in the lobby. Defendant had BE drive him to 450 Golden Gate, but BE could not observe the

26

27 ───────────────

    [1] The facts set forth in this section are supported by the PSR (*see* ¶¶ 6—16), reports of interviews
28 with the victims, and the Victim Impact Statements. In addition, the government has been informed that
   both victims hope to attend sentencing and to address the Court during sentencing proceedings.

1  proceedings; according to defendant, the proceedings were pursuant to the Foreign Intelligence

2  Surveillance Act and/or the Patriot Act and were so secret that defendant was prohibited from discussing

3  them.  When BE asked for proof of the ongoing court proceedings, defendant showed him a filing

4  captioned "United States v. Blessed Marvelous Herve."  (Unbeknownst to BE, this filing likely was

5  from defendant's 1996 federal criminal case in which he was convicted of passport fraud.  *See* PSR, ¶

6  33.)  BE recalls that in approximately 2007 and 2008, BE paid defendant approximately $200,000 for

7  costs defendant claimed were associated with this non-existent court case, other living expenses, and

8  $2800 per month purportedly for defendant's daughter.

9       In 2009, defendant told BE that defendant's top secret court case resulted in defendant pleading

10  guilty to a misdemeanor and requiring him to spend 90 days in jail.  Defendant asked BE for continued

11  financial support, all with the promise of BE getting his money back, and more, when defendant finished

12  his jail time and could finally get the $43,000,000.  BE complied until he ran out of money.  The last

13  $100,000 he gave defendant came from the inheritance BE received after his mother died.  In all, BE

14  lost more than $600,000 to defendant.

15       After BE had no more money to give, he turned to his girlfriend, KW, to support what he thought

16  were the final steps before defendant could repay the $600,000, plus interest and substantial bonuses, out

17  of the soon-to-be-released $43,000,000.  KW had been a schoolteacher for more than 30 years.  She had

18  worked hard—sometimes working two jobs—to save for a well-earned retirement.  She owned two

19  homes plus a condominium (with her sister), and had more than $500,000 in retirement savings.

20  Defendant promised that he would pay KW substantial interest plus a huge bonus if she would loan him

21  money to assist with his court case until the eventual release of his seized funds.  KW has never met

22  defendant; defendant made these statements over phone calls, calls from blocked numbers initiated by

23  defendant because, he claimed, he could only call out from jail at certain times.  Defendant repeatedly

24  claimed to BE and to KW that he was near victory in his court case and thus the release of funds was

25  imminent.  But if BE and KW did not continue to support his case, defendant claimed, he would lose his

26  case and never pay them back what they had loaned him to date, let alone the interest and bonuses.  So

27  KW funded these purported costs, which included $10,000 defendant claimed were for transportation

28  expenses for two Swiss bankers to testify on defendant's behalf, thousands of dollars for shots defendant

1  claimed were necessary to obtain medical clearance to be released from jail, $2800 per month for child

2  support (defendant told his victims that the child support payments were so high because they were

3  based on the dozens of millions of dollars that had been seized from him), and even for the cell phone

4  bills defendant was amassing by calling BE and KW from jail through the use of a friend's phone.

5        Throughout his scam, defendant claimed to his victims that if he lost his court case, he would

6  lose all of his money, be deported, and be killed by his father for bringing shame to the family.

7  Defendant said his father had murdered his mother because she brought shame to the family.

8  (Defendant told the Probation Officer that his mother died shortly after his birth as the result of

9  complications from child birth.  (PSR, ¶ 43.))

10       KW made her last payment to defendant, $47,000, in October 2012.  Luckily she did not grant

11 defendant's request for yet another "final" payment of $55,000 shortly thereafter.  In all, defendant

12 fleeced KW out of more than $950,000, bringing his total from BE and KW to more than $1.6 million of

13 fraudulently obtained money he took in over the course of approximately 6 years.

14 **Defendant's Arrest and Contact with Law Enforcement**

15       In early April 2013, after FBI agents went to interview defendant but did not find him at home,

16 defendant learned of the visit and traveled to the FBI offices at 450 Golden Gate Avenue in San

17 Francisco.  During this visit, defendant continued to claim that his father was the leader of an African

18 country, and that, as a result, defendant had insight into regional politics in Africa.  As an example,

19 defendant claimed that during the Libyan conflict, defendant had called the FBI to report information he

20 had on Libyan officials, and that he proceeded to work with the State Department during the "crisis in

21 Libya."  As he did with his victims, defendant showed the FBI several certificates to support his claim

22 that he was a good citizen and loved the United States.  Defendant then used his children to further his

23 fraudulent purposes:  after his landlord told defendant he would be evicted if the FBI visit meant he had

24 been "causing trouble," defendant told the FBI that defendant was concerned that if he were evicted, his

25 children would have no place to live.  This was not the first time defendant invoked his children in

26 connection with his fraudulent scheme.

27       On April 24, 2013, defendant was arrested after a Criminal Complaint was filed against him.  On

28 that date, he made the following false statements, among others, to FBI agents:

1

2
- he claimed that it was victim BE who had pressured defendant into going into business together despite defendant's reluctance because he was still adjusting to losing his family to political assassinations;

3

4
- he claimed that he never told BE or anyone else that his father was the President of the Congo;

5

6
- he alleged that BE was using defendant's "desperate economical disadvantage" and was taking "advantage of the situation" by giving defendant money with high expectations of income from their purported business venture;

7
- he never told BE that he was going to receive a significant amount of money seized by the United States;

8
- he never told BE he lived at the Four Seasons or had BE pick him up from there;

9

10
- he never asked BE for money and he never told BE he needed money to avoid being deported, for a court case, for an attorney, or to make child support payments;

11
- he was completing a jazz album for which he will be paid $5 million, which he will use to pay back BE; and

12

13
- he needed to be released because his children needed him and were very important to him.

14 **The Plea Agreement and the Sentencing Guidelines**

15   Defendant did subsequently admit his guilt when he entered his guilty plea on September 6,

16 2013.  In that Plea Agreement (Dkt. 31), defendant agreed to plead guilty to one count of wire fraud, in

17 violation of Title 18, United States Code, Section 1343.  In the Plea Agreement, the parties agreed that

18 the Base Offense Level is 7, that a 16-level enhancement applies as a result of defendant causing losses

19 of approximately $1,600,000, and that a 3-level decrease applies for acceptance of responsibility.  (Dkt.

20 31, ¶¶ 2, 7.)  As a result, the Total Offense Level is 20.  Although defendant has some criminal history,

21 defendant's Criminal History Category is I.  Accordingly, the applicable Guidelines range of

22 imprisonment is 33-41 months.

23   In the Plea Agreement, which was entered into pursuant to Rule 11(c)(1)(c), the parties agreed

24 that a reasonable and appropriate sentence under the Guidelines and 18 U.S.C. Section 3553(a) is a term

25 of imprisonment within the Guidelines range set forth above (33—41 months) followed by 3 years of

26 supervised release, plus restitution of approximately $1,700,000 and a fine determined by the Court.

27 (Dkt. 31, ¶ 8.)  In addition, the United States agreed to recommend a sentence of imprisonment at the

28 mid-point of the Guidelines calculation; that mid-point is 37 months.  (Dkt. 31, ¶ 15.)  The Probation

1    Office joins the government in recommending a sentence of 37 months imprisonment.  Defendant is

2    permitted to request a sentence of imprisonment at any point within the agreed-upon range of 33-41

3    months, and he has requested the low-end of the range, 33 months.

4    **Sentencing Factors**

5        An analysis of the factors set forth in 18 U.S.C. Section 3553(a) shows that a sentence at the low

6    end of the range is not appropriate in this case, and that a sentence at the mid-point of the applicable

7    range is more appropriate and warranted.

8        <u>The Nature and Circumstances of the Offense (18 U.S.C. Section 3553(a)(1))</u>

9        The nature and circumstances of defendant's fraudulent scheme are largely set forth above and in

10    the PSR.  Certain factors, however, show that a low-end sentence is not appropriate and support the

11    government's and Probation's recommended sentence of imprisonment.  One such factor is that the

12    nature and circumstances of defendant's offense included severe adverse impacts upon individual

13    defendants.  The victims' retirement accounts are gone, and they are at a point in life where they cannot

14    replenish them.  Both victims borrowed money from friends and family; that money is gone.  The

15    victims borrowed against insurance policies; that money is gone.  The victims borrowed against their

16    homes; that money, along with the two homes used to secure those loans, is gone.  BE's entire

17    inheritance from his mother ended up in defendant's pocket.  Both victims have had to return to work at

18    times when they should be enjoying retirement.  KW, a career schoolteacher, has had to abort her

19    retirement to work a $12 per hour job in a clothing store. Neither victim will be able to spend money on

20    their kids or grandkids, let alone leave them any meaningful inheritance.

21        Furthermore, the victims' losses in this case correlate directly to defendant's gain from his fraud

22    scheme.  Every dollar the victims lost went straight to defendant, so the Sentencing Guidelines in this

23    case are driven by an accurate measure of the financial harm defendant caused, and that figure is equal

24    to defendant's financial gain from his fraud:  approximately $1,600,000.  That amount is near the mid-

25    point of the range in the Guidelines ($1 million to $2.5 million) resulting in the loss enhancement the

26    parties and Probation agree is applicable, further supporting a sentence of imprisonment at the mid-point

27    of the applicable range.

28        Beyond the financial impact, victim KW illustrates the deeper, non-economic scars left by

1  defendant's fraud.  Before she had the misfortune of connecting with this defendant, KW reports she

2  was happy, outgoing, belonged to community service groups, and volunteered to help children.  Now, in

3  contrast, she has nightmares, frequently cries uncontrollably, and her happy, outgoing character has been

4  replaced by one that now experiences anxiety, anger, rage, isolation, fear, and is suspicious of people.

5  KW's family members are devastated, too, as they have witnessed the emotional and psychological

6  effects defendant's calculated, long-running fraud has visited upon their sister, mother, and

7  grandmother.

8         The nature and circumstances of defendant's offense do not weigh in favor of a low-end sentence

9  of imprisonment.

10         The History and Characteristics of the Defendant (18 U.S.C. Section 3553(a)(1))

11         Similarly, the history and characteristics of the defendant do not support a low-end sentence.

12         First, unlike many defendants in Criminal History Category I, defendant does have criminal

13  history and even one criminal history point.  In 1995 he was convicted of filing false statements on

14  DMV documents; he was sentenced to 2 years of probation.  (PSR, ¶ 32.)  In 1996, he was convicted of

15  passport fraud in federal court; he was sentenced to probation and community confinement.  (PSR, ¶

16  33.)  He also has been arrested other times.  (PSR, ¶¶ 36-39.)

17         Second, defendant has had almost no verifiable gainful employment in his life.  Aside from

18  allegedly playing in a local band (PSR, ¶60), and even assuming the existence of employment defendant

19  reported but that could not be verified, the PSR reflects that defendant was gainfully employed for a

20  total of less than 2 years from 1995 until his arrest in 2013.  (PSR, ¶¶ 61-65.)  There is zero paid

21  employment listed, or even claimed, from 2003 through 2006.

22         Defendant's history and characteristics do not support a low-end sentence.

23         The Need for the Sentence to Achieve Certain Goals of Sentencing (18 U.S.C. §3553(a)(2))

24         The seriousness of the offense, promoting respect for the law, and providing just punishment all

25  favor a mid-range sentence.  Indeed, there is no evidence this defendant has any respect for the law.  He

26  operated a 6-year fraudulent scheme, the only goal of which was to steal every dollar that he could get

27  from  BE and KW.  Defendant's scheme only stopped because he was caught; in fact, luckily for KW,

28  she had refused defendant's request for an additional $55,000.  Defendant even used the law—an

1   alleged secret federal case against him—as part of his fraudulent scheme.  Then when he learned the FBI

2   had come to speak with him, he brazenly came to the FBI offices and lied to two federal agents while

3   proclaiming love and respect for the United States.  Finally, after he was arrested, he spun a fabricated

4   tale to two more federal agents.  This lack of respect for the law does not warrant a low-end sentence.

5        That lack of respect combined with a lack of evidence that defendant has even tried to find and to

6   maintain legitimate employment establish that defendant poses a high risk of committing future crimes.

7   From 1995 to 2001 (age 23 to 29), defendant claims to have had five jobs, none of which lasted more

8   than a few months,[2] and one of which lasted two weeks.  After 2001, there is a 4- to 6-year gap in

9   employment, *even as reported by defendant*.  (*See* PSR ¶¶ 59—65).  Defendant then reports that from

10  2007 until his arrest in 2013 he worked 40 hours per week playing in a jazz band that bore his name.

11  This unverified (PSR, ¶60) claim happens to coincide with the timeline of defendant's fraudulent

12  scheme.  It appears that instead of working or even trying to work, defendant's business plan was to

13  fleece his victims out of as much money as he could and live off of that.  He executed that business plan

14  for 6 years, hauling in $1.6 million.

15       The government agrees with Probation that a mid-range sentence, not a low-end one, will better

16  reflect the seriousness of the offense, will better promote respect for the law, will provide just

17  punishment, will better afford adequate deterrence (both specific and general), and will better protect the

18  public from further crimes of this defendant.

19       The Need to Avoid Unwarranted Sentencing Disparities (18 U.S.C. § 3553(a)(6))

20       For the reasons set forth above, a mid-range sentence best avoids any unwarranted sentencing

21  disparities.  Defendant's Guidelines are fairly driven by a substantial loss amount that corresponds with

22  what he gained from his long-running fraudulent scheme.  That loss amount is at the middle of the

23  loss/gain range resulting in a 16-level enhancement.  Defendants in that range who caused less loss (i.e.,

24  closer to $1,000,000) and who have no criminal history are more fairly deserving of a sentence at the

25  low-end of the resulting range for an Offense Level 20 and Criminal History Category I.

26

27       [2] The government notes defendant's claim that he worked—on a volunteer basis—for California

28  State Assemblywoman Carole Migden for three years.  To the extent defendant claims that was a
    consistent job lasting 3 years, there is no credible evidence to support such a claim.

1    The Need to Provide Restitution to Victims (18 U.S.C. § 3553(a)(7))

2    Although there is a need to provide restitution to the victims, and defendant has agreed that part

3    of his sentence will include a restitution order of approximately $1.7 million, there is no reason to

4    believe defendant ever intended to pay back his victims, intends to do so now, or ever will repay them.

5    This factor does not support a low-end sentence.

6    **Conclusion**

7    Defendant's actions have demonstrated that he is a dangerous con man, and there is little, if any,

8    reason to believe he will change.  Even his PSR lacks the usual apology and claimed desire to try to

9    repay the victims.  (*See* PSR, ¶18, where it is typically found.)  Unlike more common white collar

10   defendants who invest but lose and cover it up or who at least make lulling payments to victims, this

11   defendant never intended to or did repay a penny to his victims.  His plan was simply to steal all the

12   money he could from them and then disappear by claiming he had been incarcerated, deported, or both.

13   For these reasons, the government respectfully requests that the Court sentence defendant to 37

14   months in prison, three years of supervised release, no fine, restitution of $1,605,926, and the mandatory

15   $100 special assessment.

16

17   DATED: January 15, 2014                         Respectfully submitted,

18                                                   MELINDA HAAG
                                                     United States Attorney
19
20                                                   _____/s/_____
                                                     W. DOUGLAS SPRAGUE
21                                                   Assistant United States Attorney

22

23

24

25

26

27

28